Leonard J. Erickson v. Commissioner.
Erickson v. Commissioner
Docket No. 54828.
United States Tax Court
T.C. Memo 1956-256; 1956 Tax Ct. Memo LEXIS 36; 15 T.C.M. (CCH) 1338; T.C.M. (RIA) 56256; November 19, 1956
*36 Harry L. Brown, Esq., and Louis Herman, Esq., 149 Broadway, New York, N. Y., for the petitioner. Theodore E. Davis, Esq., for the respondent. RAUM
Memorandum Findings of Fact and Opinion Respondent has determined a deficiency in petitioner's income tax for the calendar year 1949 in the amount of $6,157.42. The sole issue is whether a certain payment to petitioner by a corporation constituted the partial repayment of a loan as contended by petitioner, or a taxable dividend, as determined by respondent. Findings of Fact Petitioner is an individual residing at 1120 Park Avenue, New York City. His individual income tax return for the calendar year 1949 was filed with the then collector of internal revenue for the third district of New York. In 1945 Walter Reade, Sr., now deceased, approached petitioner and his brother Frank Erickson (hereinafter sometimes called "Frank") with respect to possible acquisition of a parcel of improved real property (hereinafter called the "property") located at 487-495 Park Avenue, in New York City. The owner of the property, Central Savings Bank in the City of New York (hereinafter called "Central"), had previously acquired it by *37 foreclosure. Walter Reade, Sr., indicated that the property could be purchased for about $600,000. He was of the opinion that after reconversion of the premises into a first-class motion picture theater, offices and stores, it would represent a sound investment. Petitioner agreed to take a 12 1/2 per cent interest in the venture, and Frank an interest of 37 1/2 per cent, the remaining 50 per cent being controlled by Walter Reade, Sr. A contract was executed requiring Walter Reade, Sr., to purchase the property from Central, and the purchase was in fact consummated on October 19, 1945. The improvements on that date consisted of a five-story office building. Title was taken in Walter Reade, Sr.'s name alone, but it was understood that petitioner and Frank were to have the aforementioned respective interests therein. Walter Reade, Sr., also planned to give a 25 per cent interest to each of his two children, Suzzanne Gage and Walter Reade, Jr., thus disposing of his one-half. The parties planned to form a corporation to take over the property, in which the Reade interests and the Erickson interests would each receive 50 per cent of the capital stock. The purchase price of the property *38 was $625,000. $150,000 was paid by check and the balance by a ten-year 3 1/2 per cent purchase money mortgage. In addition, closing expenses were incurred in the amount of $7,126.16. Walter Reade, Sr., and the Ericksons each paid one-half of the cash outlay of $157,126.16. The portion contributed by the Ericksons was paid by their nominee, Frank W. Watson (hereinafter sometimes called "Watson"). In this manner, petitioner paid $19,640.77 and Frank paid $58,922.31. In all transactions herein Watson acted solely as nominee for petitioner and Frank. Park Avenue - 59th Street Corp. (hereinafter sometimes called the "corporation") was organized on January 7, 1946, under the laws of the State of New York for the sole purpose of taking title to and operating the property. Capital stock of a stated value of $100 per share was issued as follows: James W. Watson
50 shares
Walter Reade, Jr.
25 shares
Suzzanne Gage
25 shares No further certificates of capital stock were ever issued. Payment for the foregoing stock was noted by a debit to the loans payable accounts of Watson and Walter Reade, Jr. The stock in the name of Walter Reade, Jr., is unqualifiedly owned by him *39 as his property, and is under his sole control. It does not appear whether that of his sister is held by her under the same circumstances. Walter Reade, Jr., has continuously been president of the corporation since its inception. He was 29 years of age on October 30, 1946. Suzzanne Gage is Walter Reade, Sr.'s daughter and the wife of Edwin Gage, who has at all times been secretary of the corporation. She was 27 years of age on October 30, 1946. Her husband's age at that time was 31. Watson is Frank's son-in-law, and has been treasurer of the corporation ever since it was formed. On October 30, 1946, he was 26 years of age. The property was transferred to the corporation on October 30, 1946. The lapse of time between the formation of the corporation and the foregoing transfer was the result of difficulty encountered in obtaining a theater license. Litigation in Walter Reade, Sr.'s name, as owner, had been commenced against the appropriate official for the purpose of obtaining such license. The license was acquired, and the property was then transferred to the corporation. Prior to December 31, 1945, additional cash in the amount of $100,000 was advanced for use in alteration of *40 the building. Walter Reade, Sr., advanced $50,000 thereof and the Ericksons, through Watson, advanced the remaining $50,000, $37,500 by Frank and $12,500 by petitioner. Between January 1, 1946 andoctober 30, 1946, further advances were made for the same purpose in the total amount of $603,292.54. $206,855.62 of this latter amount was advanced by Walter Reade, Sr., $297,327.69 by Frank and $99,109.23 by petitioner. Prior to October 30, 1946, $28,500 had been paid on the purchase money mortgage. $15,614.97 thereof represented the payment of interest due and the remainder constituted amortization payments. On October 30, 1946, the property plus various other assets, subject to certain liabilities, was conveyed by Walter Reade, Sr. to the corporation. The following entries were made on the books of the corporation to reflect this transaction: November 1, 1946
Dr.
Cr.
Cash in bank
$ 45,533.88
Petty Cash
75.00
Accounts Receivable - Park Ave. Theatre Ltd.
3,175.47
Building
632,126.16
Improvements: General Contracting
$189,258.15
Plastering
46,649.40
Plumbing
53,862.73
Air conditioning
58,373.00
Lumber
268.12
Steel
103,953.00
Electrical
23,859.06
Elevators
14,392.00
Hardware
937.80
Steam
852.91
Light
590.01
Signs
277.75
Insurance
1,281.38
Professional Services
28,775.00
Furniture & Fixtures
39,334.66
Salaries
24,515.99
Administrative Supervision
9,000.00
General Expense
2,946.90
Real Estate Taxes
21,868.00
620,995.86
Payroll Taxes
579.24
Interest on Mortgage
15,614.97
Cost of Lease - World Wide Development Co.
12,500.00 lLoans Payable - W. Reade, Sr.
$335,418.70
James Watson
525,000.00
Mortgage Payable
462,114.97
Withholding Tax - Payable
1,078.40
Miscellaneous Income
650.00
Deferred Rent Income
6,250.00
F.O.A.B. Tax Payable
88.74
To record acquisition of title to real estate at Park Avenue and 59th St., from Walter Reade
per deed dated 10/30/46 together with all assets pertaining thereto and the assumption of all
liabilities incurred in the construction and/or the operation of the building existing at November
1, 1946 both known and unknown.
*41 From October 30, 1946 to December 31, 1946, the additional sum of $139,581.30 was advanced to the corporation in respect of alteration and renovation of the building. Of that amount Walter Reade, Sr., advanced $64,581.30, petitioner advanced $18,750 and Frank advanced $56,250. Between January 1, 1947 and March 31, 1947, an additional $100,000 was advanced by petitioner and Frank for the foregoing purpose. Petitioner advanced $12,500 thereof and Frank advanced the balance. After March 31, 1947, the corporation repaid to the Ericksons funds previously advanced to it as above set forth on dates and in amounts as follows: Date
Petitioner
Frank
5/ 1/47
$ 10,416.67
5/28/47
10,416.67
6/25/47
10,416.67
7/28/47
10,416.67
8/27/47
8,333.32
12/18/47
$31,250.00
93,750.00
$31,250.00
$143,750.00
On December 17, 1947, Walter Reade, Sr.'s wife, Gertrude B. Reade, advanced $125,000 to the corporation, which it then repaid to the Ericksons on the following day as above set forth. That action equalized the net advances by the Reades and the Ericksons. Prior to December 17, 1947, no notes were issued to any of the parties for their advances. However, *42 on December 17, 1947, unsecured notes bearing interest at two per cent per annum and maturing February 1, 1962, were issued as follows: Named Payee
Amount
Gertrude B. Reade
$125,000
[1] Walter Reade 395,000
James W. Watson
520,000 On December 31, 1947, the foregoing amounts were reflected as notes payable in the books and records of the corporation. The notes to Watson and Walter Reade [1] were predated to February 1, 1947, while that to Gertrude B. Reade was dated December 17, 1947. The first $125,000 due on the Watson note and the Gertrude B. Reade note were to be paid simultaneously and in equal amounts. Thereafter payments on the balance of the Watson note and on the amount due on the Walter Reade note were to be made simultaneously and in equal amounts. Two alternative methods were commonly used in financing improvements. In some cases an improvement loan would be sought in advance of actual improvement. Other owners would wait until the property had been improved, and then *43 attempt to refinance the real estate as a whole. At the time the property was first acquired from Central it was the intention of the parties to advance funds of their own temporarily for alteration and renovation, then to refinance by means of a new first mortgage, once the alterations had been completed. Walter Reade, Sr., was of the opinion at that time that sufficient refinancing could be thus obtained to permit repayment of the entire amount of advances made. The possibility of initially financing the improvements by obtaining an improvement loan had also been discussed. It was decided that the better course would be to lend the money themselves and then refinance after the value of the property had been enhanced by the anticipated improvements. At or about 1946 in the general area in which the property was located, capital investment typically represented 15 to 20 per cent of the value of the property and the balance was represented by mortgage indebtedness. Cash invested would tend at that time to approximate one year's gross rental. Petitioner intended at all times that at least a substantial part of advances by him were temporary and were to be repaid upon refinancing *44 shortly after the work was completed. When the improvements were completed the interested parties attempted to refinance the property by a loan in the amount of $1,000,000. Central held the existing purchase money mortgage, and the parties first approached James Lee, who was a vice president of that institution, for the purpose of refinancing. Lee refused to refinance for reasons not relevant to this proceeding. He then pointed out to Walter Reade, Jr. that there was no prepayment clause whatever in the purchase money mortgage. Walter Reade, Jr. had not been previously aware of that fact. Other banks were approached for the purpose of attempting to refinance the property. The First National Bank of Boston indicated a willingness to make a first mortgage loan of $900,000, provided the purchase money mortgage was prepaid. A prepayment bonus of $20,000 was offered to Central. Walter Reade, Jr. attempted to have friends with banking connections intervene in his behalf, but prepayment was nonetheless refused. During the course of the acquisition and improvement of the property, advances by the Ericksons were substantially in excess of those by the Reades. They did not at that time *45 consider this to be material, inasmuch as it was anticipated that such excess advances would be repaid shortly from proceeds secured through refinancing. Subsequently, when it appeared that it would be difficult or impossible to refinance satisfactorily, the Ericksons insisted that the loans be equalized as between themselves and the Reades. Accordingly, Gertrude Reade advanced the aforementioned sum of $125,000 to the corporation. The corporation then used the funds so acquired to repay the Ericksons their respective shares of their excess advances. Interest at the rate of two per cent per annum has been paid on the foregoing notes since their issuance. Such interest was deducted by the corporation in computing its Federal income tax liability. Prior to 1949 no part of the principal was repaid. However, during 1949 the corporation made repayment of principal on the notes in the amount of $90,000, of which sum petitioner received $11,250. When Walter Reade, Sr. first acquired legal title, the property consisted of the land and a five-story apartment building. The latter had been converted into studios and art galleries, known as the Anderson Galleries. The land was rectangular *46 in shape, and consisted of 125 feet 5 inches on Park Avenue by 90 feet on 59th Street. The improvements consisted of stripping the building to its foundations and exterior walls and completely rebuilding it. As so improved it consists of a five-story fireproof and fully air conditioned store, theater, office and penthouse building. It contains approximately 1,050,000 cubic feet, and has a gross building area of 76,370 square feet and a net rental area of 61,400 square feet. The theater portion of the building constitutes one of the newest and most luxurious theaters in New York City. It contains approximately 600 seats. The lobby entrance consists of eight stainless steel, single panel plate glass doors. The walls are of marble facing and wainscot and decorative silver wallpaper. The orchestra lounge is heavily carpeted and has antiqued mirrored walls. Retention of the existing frame of the old building enabled the property to retain zoning advantages. The old building occupied the entire plot of ground. Under zoning regulations enacted subsequent to its erection, and in force in 1946, a new building could not similarly utilize the entire land area. This factor made common the *47 retention of the old frame in the reconstruction of buildings of this type. Reconstruction of the property here in question marked the beginning of a rapid post-war conversion of Park Avenue between 46th and 60th Streets into an outstanding office building section. Prior to October 30, 1946, there was in existence one lease for the second, third and fourth floors of the improved building at an annual rental of $75,000 for a period of ten years. By December 1, 1946, most of the balance of the building had been rented under three additional leases, at a total annual rental of $170,000. Two of the immediately foregoing leases, at a total annual rental of $140,000, were for a period of ten years. On March 8, 1947, another lease was secured for a five year term at an annual gross rental of $12,500. As of the period October to December of 1946 the fair market value of the property was $1,800,000. The property was assessed by the City of New York for the year 1946-1947 at $770,000, and in the years 1947-1948 and 1948-1949 at, respectively, $1,100,000 and $1,300,000. The legal requirements in force with respect to assessments in the Borough of Manhattan, City of New York, require that *48 real property be assessed at its full value for real estate tax purposes. However, the individual assessors normally fix their values for parcels of real property substantially in advance of the tax year to which a given assessment will apply. Consequently, increases in value, such as those occurring as a result of improvements or general appreciation in value of real estate in a local area, may be reflected inadequately or not at all in such assessments. The assessors do not consistently take into full consideration all factors contributing to actual value on the real estate market. And each assessor has too many individual properties to assess to permit detailed examination of each such property in determining its value. As a result assessed values are often higher or lower than the price for which a given piece of property would actually sell as the result of negotiations between a willing buyer and seller, neither of whom is under compulsion to execute a transaction. Various sales of property in the immediate area took place during 1946. 470 Park Avenue, an old 12 or 15 story apartment house, sold for $700,000. It was assessed at $925,000. 445 Park Avenue, an old unoccupied building *49 very similar to the old building on the property of the corporation prior to reconstruction, but slightly larger in land area, was sold for $1,300,000. It was assessed at $1,500,000. The amount in controversy received by petitioner in 1949 constituted the repayment of a portion of a bona fide loan and not the distribution of a taxable dividend. Opinion RAUM, Judge: The issue before us is essentially one of fact, whether the advances by petitioner (at least to the extent of the payment received by him in 1949) constituted bona fide loans or contributions to the permanent capital structure of the corporation. Cf. Estate of Herbert B. Miller, 24 T.C. 923, 929 (on appeal C.A. 9); Ruspyn Corporation, 18 T.C. 769, 776; Tribune Publishing Co., 17 T.C. 1228, 1234. No one factor, whether that of so-called "thin incorporation", proportionate debt-holding by stockholders, or any other, is itself determinative. The real issue is the intention of the parties. All such factors are merely evidence of such intention, and must be considered together with all *50 other evidence. Matthiessen v. Commissioner, 194 Fed. (2d) 659, 661 (C.A. 2); United States v. Title Guarantee & Trust Co., 133 Fed. (2d) 990, 993 (C.A. 6); Charles L. Huisking & Co., 4 T.C. 595, 599. In any event, we do not find the debt to equity ratio in the instant proceeding so disproportionate as to weigh heavily against the petitioner. We are satisfied that the building as improved was of the fair market value of $1,800,000. There can be no question as to the bona fides of the purchase money mortgage held by the bank, and the ratio relevant here is that between the purported indebtedness to the Ericksons and the Reades in the amount of $1,040,000, and the equity left to the stockholders after the fair market value of the building is reduced by the sum of the foregoing mortgage indebtedness and the purported debt owed to the Ericksons and the Reades. So computed, that ratio is approximately four to one. Cf. Sheldon Tauber, 24 T.C. 179, 183, acq., I.R.B. 1955, 2 CB 11. While such a debt to equity ratio justifies close scrutiny of the surrounding circumstances, particularly since the indebtedness here is *51 owed to stockholders or their close relatives in proportion to the stock held by members of the respective families, it cannot be said to be so extreme or unrealistic as to provide a strong inference that no part of the indebtedness in question was bona fide. The facts have already been stated at length, and no purpose would be served to restate them or the evidence upon which they are based. Viewing the record as a whole, we are satisfied that petitioner at all relevant times intended and expected that of the amounts advanced by him at least the bulk of his advances to the enterprise was of a temporary nature, and would be repaid shortly after completion of the improvements. When making such advances he was confident that sufficient refinancing would be obtainable for that purpose. The determinative fact is his intention at that time. That intent cannot be vitiated by changed circumstances or by subsequent or newly-discovered difficulties, unforeseen at the time. We are satisfied that petitioner at all relevant times intended at least a major portion of the advances by him to be loans to the corporation, and that there was in fact a bona fide indebtedness to him in an amount that *52 embraced at least the payment in controversy herein. [2]
Petitioner and the other interested parties had considered the possibility of a temporary improvement loan. Had they successfully negotiated such a loan it is inconceivable that respondent would challenge the bona fides of any such indebtedness to an independent lending institution. The record satisfies us that those parties, at least in part, put up their own money as a substitute for such loan. We are not impressed by respondent's reliance upon the absence of written evidence of indebtedness or of security at the outset. The lenders expected at least the major portion of the advances to remain outstanding only for a short period, and together they controlled the corporation directly, or indirectly through their families. The foregoing facts rob the initial absence of notes *53 and the informality of the transaction of much of the significance which respondent purports to see therein. The sum in the amount of $11,250 received by petitioner during the taxable year 1949 was not in excess of the amount owed him by the corporation, and was intended as partial repayment thereof. No part of that receipt constitutes a taxable dividend to petitioner, and respondent erred in determining a deficiency in petitioner's income tax for the calendar year 1949. Decision will be entered for the petitioner. Footnotes
1. See footnote on next page.↩
1. Neither the stipulated facts nor the note in evidence indicates whether the payee of this note was Walter Reade, Sr. or Walter Reade, Jr.↩
2. We do not here decide whether the entire amount of advances by petitioner constituted a loan, or whether in fact a part thereof was more in the nature of equity capital. Our finding to the effect that there was a loan in excess of the amount received by petitioner makes unnecessary for purposes of the instant proceeding such further determination.↩